# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | * | |
| **WOLFGANG STALEY, et al.,** | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Case No.: RWT 10cv2768 |
| | * | |
| **NATIONAL CAPITAL AREA COUNCIL,** | * | |
| **BOY SCOUTS OF AMERICA,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

## MEMORANDUM OPINION

Plaintiffs Wolfgang Staley ("Staley"), a minor suing by and through his parent and next friend, Cindy Officer ("Officer"), and Officer, individually, bring this action against Defendant National Capital Area Council of the Boy Scouts of America ("NCAC") for alleged violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. Staley and Officer claim that NCAC refused to provide a sign language interpreter for Staley, who is deaf, at Boy Scout meetings and trips in violation of federal law. For the reasons stated below, Plaintiffs' ADA claims will be dismissed and the Court will order the parties to engage in limited discovery concerning Plaintiffs' Rehabilitation Act claims.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

Staley is a thirteen year-old boy who has been deaf since birth. Compl. ¶ 9. He became a member of Boy Scout Troop 1533 in September, 2009. Compl. ¶ 11. Troop 1533 is a member of the Boy Scouts Patriot District, which is one of twenty districts within the National Capital Area Council of the Boy Scouts of America ("NCAC"). *Id.* NCAC, which is chartered by the National Council of the Boy Scouts of America, promotes scouting in the Washington, D.C. metropolitan area.

Troop 1533 meets weekly at Mantua Elementary School ("Mantua"), a public school in Fairfax, Virginia. *Id.* ¶ 12. Mantua provided an American Sign Language ("ASL") interpreter during Troop 1533's weekly meetings while Staley was a student at Mantua, but did not provide an interpreter for the troop's outdoor, off-campus scouting events, such as camping trips. *Id.* ¶¶ 15, 16.

While Staley was a member of Troop 1533, he participated in four troop camping trips. Affidavit of Cindy Officer, ECF No. 10-4 at ¶ 10. One of Staley's parents—his mother, his father, or his stepfather—accompanied Staley on each trip to serve as his sign language interpreter. *Id.* ¶¶ 11-13. Staley's parents incurred expenses for food, lodging and travel in connection with accompanying Staley on these trips. Compl. ¶ 19.

Staley is no longer a student at Mantua; he is now in middle school. *Id.* ¶ 12. Mantua has declined to provide an interpreter for Troop 1533's meetings since Staley has been in middle school. *Id.* at ¶ 20.

On October 2, 2009, Officer spoke with Peter Johnson, the Director of the Boy Scouts Patriot District, and requested that NCAC provide interpreter services at Troop 1533's weekly meetings and during the troop's camping trips. *Id.* at ¶ 13. On October 7, 2009, Lois Urbanek, Committee Chair for Troop 1533, sent an email to all of the parents with sons in Troop 1533; Diane Peterson, the lead ASL interpreter at Mantua; and Peter Johnson, indicating that the troop needed interpreter services at Troop 1533's weekly meetings and during camping trips. *Id.* at ¶ 14. Diane Peterson replied to the entire group stating that NCAC was obligated under federal law to provide interpreter services at Boy Scouts events. *Id.* The same day, Peter Johnson sent an email to Officer stating that the Boy Scouts would probably not provide an interpreter at Boy Scouts camping trips and suggested Officer look into forming an all-deaf scouting troop. *Id.* at ¶ 15.

On October 20, 2009, Officer, Johnson, Patriot District Commissioner Mark Greer and parents with sons in Troop 1533 met to discuss Officer's request that an interpreter be provided. *Id.* at ¶ 17. At that meeting, Johnson stated that NCAC was not responsible for providing interpreter services at Boy Scouts events and denied Officer's request that NCAC provide an interpreter for Staley. *Id.*

On October 21, 2009, Officer spoke with James Hamlin, NCAC's staff member responsible for scouts with disabilities. *Id.* at ¶ 18. Hamlin also told Officer that NCAC was not responsible for providing interpreter services at Boy Scouts events. *Id.*

On October 6, 2010, Officer, on behalf of Staley and herself, filed a two-count complaint against NCAC in this court, alleging violations of the ADA, 42 U.S.C. § 12101, *et seq.* and § 504 of the Rehabilitation Act, 29 U.S.C. § 790, *et seq.* ECF No. 1. On February 1, 2011, NCAC filed a motion to dismiss, or, in the alternative, for summary judgment, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56(a). ECF No. 6. NCAC contends that it is a private club exempt from the public accommodations provision of Title III of the ADA and that it is not covered by the Rehabilitation Act because it receives no federal funding. *Id.* at 1-2. The issues were fully briefed and a hearing was held on April 11, 2011. For the following reasons, NCAC's Motion to Dismiss, or in the Alternative for Summary Judgment, will be granted as to the ADA claim and denied without prejudice as to the Rehabilitation Act claim.

## STANDARDS OF REVIEW

### I.      Motion to Dismiss

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

When deciding a motion to dismiss, the Court must therefore consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe factual allegations in the light most favorable to the Plaintiff, *see Lambeth v. Bd. of Comm'rs of Davidson County*, 407 F.3d 266, 268 (4th Cir. 2005). Nevertheless, the Court is not required to accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), conclusory allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979), or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences," *Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002).

## II.     Motion for Summary Judgment

The Court must grant summary judgment to a moving party if it determines that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006); Fed. R. Civ. P. 56. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." F. R. Civ. P. 56(c)(1). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." In assessing whether

summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." F. R. Civ. P. 56(c)(3).

<u>ANALYSIS</u>

**I.     ADA Claims**

Congress enacted the ADA in 1990 to combat what it perceived to be widespread discrimination against disabled individuals. *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001). The ADA sought to comprehensively address the "outright intentional exclusion as well as the failure to make modifications to existing facilities and practices" that prevented disabled individuals from being fully "integrate[d] into the economic and social mainstream of American life." *Id.* (internal quotations and citations omitted).

Plaintiffs allege that NCAC is subject to Title III of the ADA because it owns, leases and/or operates various places of public accommodation, including a camping facility in Haymarket, Virginia; and two United States military facilities, Fort A. P. Hill and Quantico Marine Base. Affidavit of Cindy Officer, ECF No. 10-4 at ¶¶ 10, 14. Plaintiffs also claim the NCAC leases public accommodations such as ski resorts and horseback riding facilities for Boy Scout excursions, thus bringing it within the purview of the ADA.

Title III of ADA provides, in pertinent part, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C.A. § 12182. Title III applies only to public accommodations and specifically exempts "private clubs or establishments" from its coverage. *See* 42 U.S.C.A. § 12187 ("The provisions of this subchapter shall not apply to private clubs or establishments exempted from coverage under Title II of the Civil Rights Act of 1964 . . . ").

## A. NCAC is a Private Club

NCAC argues that it is not subject to Title III because it is a "private club," and does not operate, own or lease places of public accommodation. NCAC relies heavily on *Boy Scouts of America v. Dale*, 530 U.S. 640 (2000), and *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1276 (7th Cir. 1993), in support of the argument that it is a private club. Contrary to NCAC's assertion, *Dale* did not settle the issue of whether the Boy Scouts of America—or any entity commissioned by it—is a private club within the meaning of the ADA. In *Dale*, the Supreme Court held that applying New Jersey's state public accommodations law to require the Boy Scouts to readmit a discharged, openly gay assistant scoutmaster would violate the Boy Scouts' First Amendment right of expressive association. *Id.* at 656. In addressing the group's First Amendment rights, the Court noted that the Boy Scouts of America is a "private not-for-profit organization." *Id.* at 644. The Court's analysis, however, did not turn on this fact; rather, the Court found the fact that the Boy Scouts was an expressive association to be dispositive. *Id.* at 656.

The conclusion that the Boy Scouts of America is a private, not-for-profit organization is not dispositive of whether it is also a private club within the meaning of the ADA. Indeed, numerous private, non-profit organizations have been denied exempt status under the "private club" exemption to the ADA and the Civil Rights Act of 1964. *See, e.g.*, *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 677-78 (2001) (non-profit golf association's qualifying rounds and tours subject to Title III of ADA); *Nesmith v. YMCA*, 397 F.2d 96, 101-02 (4th Cir. 1968) (YMCA not a private club under Title II of Civil Rights Act despite status as non-profit corporation); *United States v. Lansdowne Swim Club*, 713 F. Supp. 785, 796 (E.D. Pa. 1989) (non-profit swim club was not a private club within meaning of Title II of Civil Rights Act). Moreover, *Dale* dealt with

a constitutional question, not a question of statutory interpretation, and *Dale* is therefore of limited guidance.

The Seventh Circuit's analysis in *Welsh v. Boy Scouts of America* is more instructive. In *Welsh*, the Seventh Circuit affirmed the district court's conclusion that the Boy Scouts of America was a private club within the meaning of Title II of the Civil Rights Act of 1964. *Welsh v. Boy Scouts of America*, 993 F.2d 1267, 1276 (7th Cir. 1993). Because the "private club" exemption contained in the ADA explicitly cross-references the private club exception contained in the Civil Rights Act, the *Welsh* decision provides a useful analytic framework for this Court to employ in determining if NCAC is a private club under the ADA. *See* 42 U.S.C.A. § 12187.

The *Welsh* court outlined seven factors relevant to determining whether an organization is a "private club": (1) the genuine selectivity of the group; (2) the membership's control over the operations of the establishment; (3) the history of the organization; (4) the use of the facilities by non-members; (5) the club's purpose; (6) whether the club advertises for members; and (7) whether the club is nonprofit or for profit organization. *Welsh*, 993 F.2d at 1276. The court noted that "[i]n construing the private club exception of Title II, courts have properly placed great weight on the first factor, that of selectivity." *Id.* (citing *Tillman v. Wheaton-Haven Rec. Ass'n*, 410 U.S. 431,438 (1973) (holding swim club was not a private club within meaning of Title II of Civil Rights Act where there was "no selective element [for membership] other than race.")

The *Welsh* court found that the Boy Scouts had a "plan or purpose of exclusiveness" as evidenced by its requirement that all members willingly recite the Boy Scout Oath. *Id.* That oath required each member to pledge to do his duty to God and his country, to obey Scout law, to help others, and to keep himself "physically strong, mentally awake, and morally straight." *Id.*

The *Welsh* court concluded that the Boy Scouts were a genuinely selective organization with limited membership.

With respect to the third and fifth factors, the court found that the prevalence of the Oath throughout the eighty year history of the Boy Scouts demonstrated that the Boy Scouts was a genuinely private club whose purpose was to instill certain values in its members. *Id.* at 1277. The fact that the organization was a nonprofit further indicated to the Court that the Boy Scouts was a *bona fide* private club.

The court rejected the notion that the size of the Boy Scouts organization—consisting of over five million members—deprived it of private club status. *Id.* In spite of the fact that the Boy Scouts advertised for members and was a large organization, the genuine selectivity of the organization, along with its history, purpose and nonprofit status convinced the court that the organization was, indeed, a private club within the meaning of Title II. *Id.*

Plaintiffs argue that NCAC is not a genuinely selective private club because the only restrictions on membership in NCAC are age and that the individual is a heterosexual with a belief in any God. Pls.' Opp'n, ECF No. 10 at 21-23. Similarly, Plaintiffs claim that because NCAC has over 50,000 participants, it cannot be a private club. *Id.* at 22. Plaintiffs suggest that they need additional discovery to determine whether NCAC is a private club because such a determination is fact-intensive. *Id.* at 23.

The Fourth Circuit has directed that "[i]n determining whether an establishment is in fact a private club, there is no single test." *Nesmith v. YMCA*, 397 F.2d 96, 101 (4th Cir. 1968). However, this Court believes *Welsh* lays out the proper factors to be considered in making this determination.

NCAC was chartered by the Boy Scouts of America to promote scouting in the Washington, D.C. metropolitan area. Def.'s Motion to Dismiss, ECF No. 6-1 at 6. Like its

parent organization, the Boy Scouts of America, NCAC accepts for membership only those boys who will willingly recite the Scout oath, affirm their belief in God, and commit to keeping themselves "physically strong, mentally awake, and morally straight."[1]  NCAC is therefore a genuinely selective organization—membership is not open to every individual who seeks to participate, but only those who will commit to living by certain values.  NCAC also shares its purpose with the Boy Scouts of America—to instill a set of values in young boys that includes recognition of their duty to God, their country, and others, and the responsibility to be trustworthy, obedient, loyal, cheerful, helpful, thrifty, friendly, brave, courteous, clean, kind and reverent.  *See Dale*, 530 U.S. at 649 (reciting Boy Scout Law).

NCAC's history dates back almost to the founding of Boy Scouts of America, which was incorporated in 1910.[2]  NCAC was first registered as a District of Columbia corporation on May 11, 1922.[3]  Its founding predates the enactment of both the Civil Rights Act and the ADA, and therefore this Court cannot infer that the Boy Scouts chartered NCAC in an attempt to avoid the mandates of either act.  *See Welsh*, 993 F.2d at 1276 (Boy Scouts' selective membership device was not mere "subterfuge designed to avoid coverage of Title II").  Rather, the long history of NCAC suggests that it has promoted scouting in the Washington, D.C. area for over eighty years with the goal of instilling in young men the values encompassed in the Boy Scouts' Oath and Law.  In addition, NCAC, like the Boy Scouts of America, is a non-profit corporation.  Thus,

---

[1] The Scout Oath states that "On my honor I will do my best / To do my duty to God and my country / and to obey the Scout Law; / To help other people at all times; / To keep myself physically strong / mentally awake, and morally straight."  *Dale*, 530 U.S. at 649.

[2] *See http://www.scouting.org/About/FactSheets/100_years.aspx* (noting Boy Scouts of America incorporated in 1910).

[3] *See* District of Columbia Online Organization Registration Search, https://corp.dcra.dc.gov/WebSearch.aspx (last visited May 31, 2011).

four of the seven *Welsh* factors strongly support the conclusion that NCAC is a "private club" within the meaning of § 12187 of the ADA.[4]

NCAC's size—consisting of over 50,000 members—cannot alone deprive it of its private club status; as the *Welsh* court noted, it would be contrary to the purpose of the "private club" exception to "condition the private club exclusion . . . on the popularity of the organization." *Welsh*, 993 F.2d at 1277. The fact that NCAC is successful in recruiting members does not mean that it is not also genuinely selective in determining who those members will be.

Nor is the fact that NCAC owns and leases certain parks and facilities that are open to the public enough to deprive it of private club status. Plaintiffs argue that the fact that NCAC owns a camp that is open to the public, Camp William B. Snyder, in Haymarket, Virginia, and leases various places of public accommodation, including Fort A.P. Hill for the Boy Scouts' National Jamboree, deprives it of its status as a private club.

Where a membership organization's purpose is closely connected with a particular facility, several federal courts have found that the membership organization is not a *bona fide* private club. *Id.* at 1272 (collecting cases). However, NCAC's purpose is not closely linked to any particular facility; unlike a swim club, a gym, a sports field, or a golf course, NCAC can fulfill its mission of instilling certain values in its members without camping or engaging in any other recreational activity. A swim club's purpose is intertwined with a swimming pool; it cannot train swimmers without one. By contrast, NCAC is not an organization whose purpose is to teach boys to camp, and it can fulfill its purpose with or without camping facilities.

Indeed, NCAC's member troops conduct most of their activities in small, group meetings held in public schools, church basements, private buildings or private homes, not at Camp

---

[4] Though *Welsh* interpreted the "private club" exception to Title II of the Civil Rights Act, its analysis is highly persuasive given the ADA private club exception's cross-reference to the Civil Rights Act's private club exception.

Snyder, Fort A.P. Hill, or any other place of public accommodation.[5]  This highlights the true

purpose of NCAC—the group exists to facilitate meetings of small groups of boys committed to

a core set of values, not to engage in a specific sporting or recreational activity linked to any

particular place.  In sum, the fact that NCAC is large, advertises for members, and opens some of

its parks to the public is not enough to deprive it of its private club status, because it clearly

exercises selectivity in choosing its members, and its history, purpose, and non-profit status all

indicate that it is a *bona fide* private club.

Plaintiffs argue that the purpose of the private club exception is to respect a private club's

freedom to choose its members, not to allow a private club to decline to accommodate those with

disabilities who have already been accepted as members.  Pls.' Opp'n at 28.  Plaintiffs reason

that NCAC has already accepted Staley as a member, and therefore its freedom of association is

not compromised by requiring it to comply with the ADA.  *Id.*[6]

This Court has found no support for this interpretation in the statute itself or in its

legislative history.  Though protecting a club's freedom of association was doubtless one of the

aims of Congress in exempting private clubs from complying with the ADA, the Court has

before it no evidence to support Plaintiffs' argument that this was Congress' *sole* reason for

exempting private clubs. The legislative history explains the private club exception perfunctorily:

---

[5] Public schools do not fall within the definition of "public accommodation" under Title III of the ADA, and therefore, Troop 1533's use of Mantua, a public school, for its weekly meetings does not convert these private club meetings into places of public accommodation.  *See* 28 C.F.R. Pt. 36, App'x B ("Facilities operated by government agencies or other public entities as defined in this section do not qualify as places of public accommodation.  The actions of public entities are governed by title II of the ADA . . . ") (available at http://www.ada.gov/reg3a.html). Meetings are open only to Scouts, leaders, and occasionally, their parents and potential recruits.  *See* Def.'s Reply at 20.

[6] In support of drawing this distinction, Plaintiffs cite *Crawford v. Willow Oaks Country Club, Inc.*, 66 F. Supp. 2d 767 (E. D. Va. 1999), in which the court held that the private club exception to Title VII could not be grafted onto 42 U.S.C. § 1981 because the freedom of association the "private club" exception seeks to protect "is not compromised by prohibiting the club from discriminating against those with whom it has willingly associated." Such a fleeting reference regarding the purpose of an entirely different statute is insufficient to convince this Court to limit the private club exception embodied in the ADA, absent evidence of Congressional intent to do so.

> This section creates an exemption from this title for private clubs
> and religious organizations. The exemption for private clubs is
> intended to operate in the same narrow manner as in title II of the
> Civil Rights Act of 1964.

P.L. 101-336, House Report No. 101-485(III), May 15, 1990.

There is simply no indication in the legislative history that Congress intended to limit the applicability of the private club exemption to situations in which *non-members* with disabilities seek relief. Absent some indication from Congress that the exemption is so limited, this Court will not read additional language into the statute.

The Court concludes that NCAC is a private club within the meaning of § 12187 of the ADA, and therefore is exempt from the ADA's mandates. This conclusion is consistent with the conclusions of two of our sister courts, which have applied the *Welsh* factors in cases involving the Boy Scouts of America and the Girl Scouts of America and have concluded that these organizations are private clubs within the meaning of the ADA. *See Rasmussen v. Central Florida council, Boy Scouts of America v. Rasmussen*, 2008 WL 681055, **8-9 (M.D. Fla. March 7, 2008) (Boy Scouts of America is private club within meaning of ADA); *Roman v. Concharty Council of Girl Scouts, Inc.*, 195 F. Supp. 2d 1377, 1380-82 (M.D. Ga. March 1, 2002) (applying *Welsh* factors in Title VII and ADA context and holding that local Girl Scout council was a "bona fide private membership club"). Plaintiffs cite no case in which any court has held that the Boy Scouts of America or one of its local councils is *not* a private club. Because NCAC is a private club, it is exempt from complying with the mandates of the ADA pursuant to 42 U.S.C.A. § 12187.

**B. NCAC is Not a Place of Public Accommodation**

Plaintiffs allege that NCAC is a place of public accommodation, and therefore must not discriminate against Staley on the basis of his disability pursuant to Title III of the ADA. NCAC denies that it is a place of public accommodation.

As discussed, *supra*, Title III of the ADA prohibits discriminating against any individual "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation" on the basis of that individual's disability. 42 U.S.C.A. § 12182. "The phrase 'public accommodation' is defined in terms of 12 extensive categories, which the legislative history indicates 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the nondisabled." *PGA Tour v. Martin*, 532 U.S. 661, 676 (2001). These twelve categories are delineated in 42 U.S.C.A. § 12181(7), which provides:

> The following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce—
>
> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
>
> (B) a restaurant, bar, or other establishment serving food or drink;
>
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
>
> (D) an auditorium, convention center, lecture hall, or other place of public gathering;
>
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
>
> (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;

13

(G) a terminal, depot, or other station used for specified public transportation;

(H) a museum, library, gallery, or other place of public display or collection;

(I) a park, zoo, amusement park, or other place of recreation;

(J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;

(K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and

(L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

42 U.S.C.A. § 12181(7).

Again, the Seventh Circuit's analysis in *Welsh* is instructive. In *Welsh*, the Court analyzed whether that the Boy Scouts of America is a place of public accommodation within the meaning of Title II of the Civil Rights Act of 1964. *Welsh*, 993 F.2d 1267, 1269-70. The *Welsh* Court observed that "Title II delineates the entities included therein as places, establishments, lodgings, and facilities" and found that, in delineating only physical facilities and structures as places of public accommodation, Congress expressed its intent to regulate access to physical establishments and facilities, not "membership organizations whose purpose is not closely connected to a particular facility." *Id.* at 1269.

The Seventh Circuit distinguished cases in which a membership organization's purpose is closely intertwined with a particular facility, such as a swim club, from mere "gatherings of people" not linked to a particular facility. *Id.* at 1269. In rejecting Plaintiffs' argument that the ADA's expansion of the number of establishments defined as places of public accommodation indicated that Title II must be read broadly to include membership organizations, including the Boy Scouts of America, the Seventh Circuit noted that the ADA "listed over fifty specific

facilities subject to regulation, but did not include membership organizations lacking a close connection to a physical facility." *Id.* at 1270. The *Welsh* Court concluded that even under a broad reading of the public accommodations provision of Title II, the plain language of the statute foreclosed an interpretation that held private, membership organizations to be public accommodations, absent any link between the organizations and a particular, physical facility. *Id.* at 1269-75.

This Court finds the analysis of the *Welsh* Court to be persuasive. The list of public accommodations outlined in § 12181(7) of the ADA is broader than that contained in Title II of the Civil Rights Act, but like the places of public accommodation listed in Title II, the ADA defines a place of public accommodation only with reference to physical facilities and places. In delineating only physical facilities and structures as places of public accommodation, Congress expressed its intent to regulate access to physical establishments and facilities, rather than membership organizations that are not closely linked to a physical facility. Membership organizations are not similar enough to any of the listed private entities in § 12181(7) to justify an inference that Congress intended to regulate these organizations as places of public accommodation.

Plaintiffs argue that NCAC—unlike the Boy Scouts troop analyzed in *Welsh*—has a close connection to several places of public accommodation, including camps and ski resorts, and is therefore a place of public accommodation. Opp'n at 29. Plaintiffs argue that Camp Snyder, which NCAC owns, is a place of public accommodation because it is a "park," a "place of exercise or recreation," and an "inn, hotel, motel, or other place of lodging" that is open, at least at times, to the public. 42 U.S.C. § 12181(7)(A), (I), (L). Similarly, Plaintiffs contend the Fort A.P. Hill is a place of public accommodation during the National Jamboree, a recreational event that is open to members of the public. Finally, Plaintiffs argue that Troop 1533 "takes various

trips to a number of places of public accommodation" such as Jordon Hollow Stables in Stanley, Virginia; Quantico Marine Base; Timberline Ski Resort in Davis, West Virginia; and Eagle Landing, a wilderness adventure center in New Castle, Virginia, and asserts that these trips to places of public accommodation bring NCAC within the scope of the ADA's public accommodations provision.

Though *PGA Tour v. Martin* established that a membership organization can become a place of public accommodation *to the extent that it operates or leases* a place of public accommodation, Plaintiffs do not allege that NCAC leased or operated Jordon Hollow Stables, Timberline Ski Resort, or Eagle Landing.[7] Rather, Plaintiffs allege that Troop 1533 took trips to these public horseback riding, camping and skiing facilities. NCAC's connection to these places of public accommodation is tenuous, and NCAC cannot be said to "operate" or "lease" a public accommodation merely because a group of its members takes an excursion to these places.

This view has been endorsed by other federal courts. For example, in *Elitt v. U.S.A. Hockey*, the Eastern District of Missouri held that a youth hockey league did not become a public accommodation under the ADA merely because the league's members met to practice in ice rinks, which are places of public accommodation. *Elitt v. U.S.A. Hockey*, 922 F. Supp. 217, 223 (E.D. Mo. 1996). Similarly, in *Brown v. 1995 Tenet ParaAmerica Bicycle Challenge*, 959 F. Supp. 496, 498-99 (N.D. Ill. 1997), the Northern District of Illinois held that a bicycling

_____

[7] The Code of Federal Regulations also make clear that a private individual or organization can become a place of public accommodation when it leases or operates a place of public accommodation. 28 CFR § 36, App. B provides:

> "An entity that is not in and of itself a public accommodation, such as a trade association or performing artist, may become a public accommodation *when it leases space for* a conference or performance at a hotel, convention center, or stadium. For an entity to become a public accommodation when it is the lessee of space, however, the Department believes that consideration in some form must be given. Thus, a Boy Scout troop that accepts donated space does not become a public accommodation because the troop has not 'leased' space, as required by the ADA." (emphasis added).

association, a bicycle race organizing group, and the race itself were not public accommodations under the ADA. The court reasoned that these groups were "not analogous to any of the public accommodations listed in the statute" and were merely "umbrella groups that organized an event." *Id.* at 499.

An organization does not become an owner or operator of a place of public accommodation merely because a group of its members determines to visit that place of public accommodation. Such tenuous connections were rejected by the *Ellit* and *ParaAmerica Bicycle* courts and this Court similarly concludes that the connections between Troop 1533 and the places it visited are insufficient to bring NCAC within the scope of the ADA. Indeed, it would be inequitable to hold a membership organization whose members merely visit a place of public accommodation accountable for ADA non-compliance at those places of public accommodation, because a membership organization whose members merely patronize a public accommodation lacks the authority to correct any non-compliance. In contrast to the golf course leased by the PGA Tour, Plaintiffs do not claim that NCAC was the sole operator or lessee of Jordon Hollow Stables or Timberline Ski Resort during Troop 1533's visits. Because NCAC's members were merely patronizing these establishments, Title III of the ADA did not compel NCAC to bring them into compliance.

Plaintiffs also allege Staley joined Troop 1533 on an excursion to Bayport Scout Reservation ("Bayport") in Jamaica, Virginia. Bayport Scout Reservation is a 300 acre property operated by the Colonial Virginia Council, Boy Scouts of America, not the National Capital Area Council, Boy Scouts of America, the Defendant to this action.[8] This Court will not speculate on what claims, if any, Plaintiffs may wish to assert against the Colonial Virginia Council of the Boy Scouts of America. It is apparent, however, that NCAC did not become the owner,

<hr>

[8] *See* Bayport Scout Reservation website, http://www.bayportsr.org/ (last visited May 31, 2011).

operator, lessee or lessor of Bayport merely because Troop 1533 took an excursion to this facility.[9]  This Court cannot imagine that Congress intended the ADA to sweep so broadly.

With respect to Fort A.P. Hill, which has historically hosted the Boy Scouts' National Jamboree, Plaintiffs do not allege that Staley ever attended the Jamboree.  The same is true of Camp Snyder and Quantico.  Staley did not join Troop 1533 on its outing to Quantico (Officer Aff., ECF No. 10-4 at ¶ 14) and Plaintiffs' counsel candidly acknowledged at oral argument that Staley and his troop have never been to Camp Snyder.  Therefore, even assuming, *arguendo*, that the National Jamboree, Camp Snyder, and Quantico are places of public accommodation, and NCAC fails to comply with the ADA with respect to events it holds in these locations, Staley has suffered no injury in fact *vis-à-vis* these places of public accommodation.  Accordingly, Plaintiffs lack standing to challenge any violations of Title III with respect to Camp Snyder, Quantico, and Fort A.P. Hill.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (irreducible constitutional minimum of standing requires that plaintiff suffered injury in fact that was actual or imminent, not conjectural or hypothetical; there is a causal connection between the injury and the conduct complained of; and it must be likely that the injury will be redressed by a favorable decision).

In sum, Staley and Officer have not stated a claim under the ADA because NCAC is not itself a place of public accommodation, Troop 1533's trips to places of public accommodation do not make NCAC one and to the extent NCAC operates, owns or leases places of public

---

[9] Similarly, this Court will not speculate on whether the Colonial Virginia Council of the Boy Scouts of America is exempted from compliance with the ADA pursuant to the "private club" exemption.  That is not the question before the Court.

accommodation, Staley has never been denied equal enjoyment of these places on the basis of his disability.  Accordingly, Plaintiffs' ADA claim must be dismissed.[10]

## II.      Rehabilitation Act Claims

Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability in the United States, . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . .

29  U.S.C. § 794(a).

The Civil Rights Restoration Act of 1987 ("CRRA") amended the Rehabilitation Act to make clear that an entire organization is covered by the Rehabilitation Act's anti-discrimination provisions if any program or activity within the organization receives federal financial assistance.  29 U.S.C. § 794(b) ("For the purposes of this section, the term 'program or activity' means all of the operations of—(3)(A) an entire . . . private organization . . . any part of which is extended Federal financial assistance.")  The CRRA explicitly rejected a Supreme Court decision that had held that only the individual program or activity receiving federal financial assistance was subject to the Rehabilitation Act.

Plaintiffs allege that NCAC has violated and continues to violate Section 504 of the Rehabilitation Act because it is the recipient of federal financial assistance and nevertheless refuses to provide interpretation services for Staley.  Compl. ¶¶ 31-42.  Plaintiffs argue that the federal government provides financial assistance to NCAC in multiple ways, including by allowing NCAC to use Fort A.P. Hill, a U.S. military facility, free of charge to host its National Jamboree.  Similarly, Plaintiffs allege that the U.S. military provides federal financial assistance

---

[10] Because the Court concludes that NCAC is a private club and is not a place of public accommodation, Officer's claims of associational discrimination must be dismissed along with Staley's claims of direct discrimination.

to NCAC in the form of support staff who provide various services at the Jamboree free of charge.

Plaintiffs cite other examples of federal financial assistance NCAC allegedly receives. Plaintiffs allege that the Department of the Interior provided NCAC federal financial assistance when it permitted NCAC to hold an event on the National Mall, and also argues that Troop 121, a Boy Scout troop within the jurisdiction of NCAC, has a Memorandum of Agreement with Quantico Base which constitutes "federal financial assistance" because it allows the troop to use federal land at no cost. Plaintiffs also allege that Staley's troop holds certain events at Quantico. Plaintiffs' attorney submitted a Rule 56(d) affidavit stating that Plaintiffs require discovery from NCAC in order to establish the extent to which NCAC receives federal financial assistance. ECF No. 10-3 at ¶ 3. In addition, during oral argument Plaintiffs' counsel argued that discovery is necessary to allow her to understand the connections, if any, between the federal financial assistance received by the Boy Scouts of America, NCAC and the troops it charters.

NCAC has moved to dismiss, or in the alternative, for summary judgment, on Plaintiffs' Rehabilitation Act claims, asserting that it does not receive any federal financial assistance. *See* Aff. Of Les Baron, ECF No. 6-2 at ¶ 4. NCAC claims that is a mere beneficiary of government largesse, not a "recipient" within the meaning of Section 504.

The Court concludes that carefully limited discovery is warranted under Federal Rule of Civil Procedure 56(d), which provides that the court may allow a party to take discovery if the party shows by affidavit or declaration that she cannot present facts essential to justify an opposition to a motion for summary judgment without first obtaining discovery.

At present, the financial workings of NCAC are completely unknown to Plaintiffs. The Court will limit discovery to the issue of what federal financial assistance, if any, NCAC receives in order to allow Plaintiffs to discover facts relevant to opposing NCAC's motion for

summary judgment with respect to their Rehabilitation Act claims. It may well be that the limited discovery authorized will reveal that NCAC does not receive any federal financial assistance, in which case NCAC will be entitled to summary judgment on Plaintiffs' Rehabilitation Act claim. However, without affording Plaintiffs a limited opportunity to uncover pertinent facts relating to NCAC's receipt of federal financial assistance, such a grant of summary judgment would be premature.

Accordingly, pursuant to Federal Rules of Civil Procedure 56(d) and 26(b)(2), the Court will direct the parties to engage in limited discovery on the issue of whether NCAC is the recipient of federal financial assistance.

## CONCLUSION

For the reasons stated herein, Defendant National Capital Area Council, Boy Scouts of America's Motion to Dismiss, or in the Alternative, for Summary Judgment [ECF No. 6] shall be granted in part and denied in part, and the parties directed to engage in limited discovery regarding the Rehabilitation Act claims. A separate order follows.


June 9, 2011                          _____/s/_____
Date                                         Roger W. Titus
                                             United States District Judge